NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

J.A.W.,                                                )
                                                       )
                    Appellant,                         )
                                                       )
v.                                                     )          Case No. 2D15-4281
                                                       )
STATE OF FLORIDA,                                      )
                                                       )
                    Appellee.                          )
_____)

Opinion filed September 28, 2016.

Appeal from the Circuit Court for Sarasota
County; Lee A. Haworth, Judge.

Andrea Flynn Mogensen of Law Office of
Andrea Flynn Mogensen, P.A., Sarasota,
for Appellant.

Pamela Jo Bondi, Attorney General,
Tallahassee, and Kiersten E. Jensen,
Assistant Attorney General, Tampa, for
Appellee.


KHOUZAM, Judge.

        J.A.W., a juvenile, appeals his disposition for sending written threats to kill

or do bodily injury under section 836.10, Florida Statutes (2014).  He was found to have

committed this delinquent act after he posted on Twitter that he was going to "shoot up"

his school.  Because J.A.W.'s threats were not sent directly to the alleged victims or

their families as prohibited under the plain language of section 836.10, we are constrained to reverse.

The record shows that J.A.W., a student at Sarasota High School, posted the following tweets over a span of several days:

- "can't WAIT to shoot up my school";

- "it's time" (this tweet included a photo of a gun being put in a backpack);

- "My mom and dad think I'm serious about shooting up my school I'm dying";

- "school getting shot up on a Tuesday";

- "night f[***]ing sucked can't wait to shoot up my school soon";

- "I sincerely apologize to anyone who took me seriously.  I love my high school and honestly own no weapons to want to harm anyone in any way."

In these tweets, J.A.W. mentioned @Duhssault, a group of his friends who did not live in Florida and were not students at Sarasota High School.  J.A.W. later maintained that the tweets were meant as a joke shared to this group of friends who often joked about being unfairly stereotyped as potentially violent based on their interest in video games and rock music.  He expressed disbelief that anyone would take the tweets as a serious threat.

However, J.A.W. had not protected his tweets; therefore, the tweets were, by default, public.[1]  They had been broadcast to his followers, they could be found and viewed by anyone on the Internet (with or without a Twitter account), and they could be

---

[1]About Public and Protected Tweets, Twitter Help Center, https://support.twitter.com/articles/14016 (last visited Aug. 9, 2016).

retweeted by any other Twitter user (thereby broadcasting them to all of that user's followers). One member of @Duhssault, @Glo, replied to one of J.A.W.'s tweets, mentioning several law enforcement agencies, news outlets, and public figures, including the FBI, CIA, Fox News, and President Obama. Though J.A.W. indicated that he believed the tweets would be private, he also acknowledged that they had been retweeted by "a bunch of people [with] like 40,000 followers." There was no evidence presented to show whether any of J.A.W.'s followers were students or staff at his school or members of their families. The tweets were discovered by an out-of-state watchdog group called GeoCop, who reported them to local law enforcement. Law enforcement viewed the tweets, determined that they referenced Sarasota High School, and relayed the threat to school officials. Once school officials were alerted, they devised a plan for safely dismissing the students. Law enforcement officers were stationed around the school to keep everyone safe. Law enforcement found J.A.W. at his home, which was located only several hundred feet away from the school, and took him into custody.

We must determine whether this evidence was sufficient to support J.A.W.'s disposition for sending written threats to kill or do bodily injury under section 836.10, which provides as follows:

> Any person who writes or composes and also sends or procures the sending of any letter, inscribed communication, or electronic communication, whether such letter or communication be signed or anonymous, <u>to any person, containing a threat</u> to kill or to do bodily injury <u>to the person to whom such letter or communication is sent</u>, or a threat to kill or do bodily injury to any member of the family of the person to whom such letter or communication is sent commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(Emphasis added.)  We must construe this statute according to its plain and ordinary meaning; we cannot add words that were not included by the legislature.  See Exposito v. State, 891 So. 2d 525, 528 (Fla. 2004).  And because this statute is clear and unambiguous, we cannot look behind its plain language or resort to the rules of statutory construction in order to ascertain the legislature's intent.  See Daniels v. Fla. Dep't of Health, 898 So. 2d 61, 64 (Fla. 2005).

The plain language of section 836.10 makes clear that it only applies where a threat is sent directly to a specific victim or a member of that person's family. The statute specifies that it covers communications "to any person, containing a threat to kill or to do bodily injury to the person to whom such letter or communication is sent." § 836.10 (emphasis added).  The only intermediary third parties encompassed in the language of the statute are family members of the potential victim because the statute specifically includes threats "to kill or do bodily injury to any member of the family of the person to whom such letter or communication is sent."  § 836.10 (emphasis added); cf. Calamia v. State, 125 So. 3d 1007, 1012 (Fla. 5th DCA 2013) (interpreting Florida's extortion statute, section 836.05, Fla. Stat. (2009), "to mean that the intent to compel is coupled with the intent that the communication, either directly or indirectly, reaches the coerced person" because the plain language of the statute requires "intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will." (emphasis added)).  This court has explained that section 836.10 does not criminalize written threats that have not been "sent" to the person being threatened or a member of that person's family.  See State v. Wise, 664 So. 2d 1028, 1030 (Fla. 2d DCA 1995).  The act of sending under section 836.10 requires both

- 4 -

"the depositing of the communication in the mail or through some other form of delivery" and "the receipt of the communication by the person being threatened." Id. Twitter cannot be considered a "form of delivery" under the facts of this case because, even though he posted the tweets to a public forum, there is no evidence that J.A.W. directed the threat to the potential victims aside from merely referencing "my school." Moreover, the fact that the school received the threat, without more, is insufficient to support a finding that the threat was "sent" under the very limited language of the statute.

The State also suggests that J.A.W.'s conduct constitutes "procur[ing] the sending" because "[t]o 'procure' means to persuade, induce, prevail upon, or cause a person to do something." Fla. Std. Jur. Instr. (Crim.) 8.22. However, we believe that the definition of "procure" cannot be stretched to encompass J.A.W.'s conduct because it was J.A.W.'s Twitter followers, GeoCop, and law enforcement—not J.A.W. himself— who relayed the threat to the school. There was no evidence that any of J.A.W.'s Twitter followers were students or staff at the school or members of their families. By the time it was received by the school, the threat was several steps removed from its original context.

In O'Leary v. State, 109 So. 3d 874, 877 (Fla. 1st DCA 2013), the First District applied Wise in the context of threats publicly made on social media and determined that threats posted on Facebook had been "sent" to all of the defendant's Facebook friends for purposes of section 836.10. O'Leary posted threats against his relative and her partner. Id. at 875. The post was viewed by a mutual relative who was Facebook friends with O'Leary. Id. The First District reasoned that the appellant had specifically requested the mutual relative to be his Facebook friend, and the mutual

relative had accepted that request. Id. at 877. "By posting his threats directed to his family member and her partner on his Facebook page, it is reasonable to presume that appellant wished to communicate that information to all of his Facebook friends." Id. And because O'Leary's posts threatened a "member of the family of the person to whom" it was "sent," his post fell within the ambit of the statute. § 836.10; O'Leary, 109 So. 3d at 877-78. The instant case is factually distinguishable from O'Leary because there was no evidence showing that J.A.W.'s threats were sent directly to any of the potential victims or their family members—rather, the threat was publicly posted on social media and relayed by nonfamily third parties to the potential victims.

We hold that the plain and unambiguous meaning of section 836.10 requires a showing that the threat was sent directly to the potential victims or their family members. Here, the State did not present any evidence that J.A.W.'s threat was received directly by any students or staff at Sarasota High School or any of their family members. Rather, J.A.W. publicly posted the threat, it was retweeted, it was discovered by GeoCop, and it was finally relayed to the school. Considering these facts, the receipt of the threat by the school was simply too far removed from the original context in which it was posted to support J.A.W.'s disposition for sending written threats to kill or do bodily injury. Accordingly, J.A.W.'s disposition must be vacated. See Santiago v. State, 874 So. 2d 617, 624 (Fla. 5th DCA 2004) ("[I]f it is determined either by the trial court or appellate court that the evidence is insufficient to sustain a conviction, the proper remedy is acquittal and not a new trial.").

We emphasize, however, that the type of threats at issue in this case pose a serious problem. Social media is a relatively new and extraordinarily popular form of

communication.  According to the Pew Research Center, in 2015 a full 65% of American adults used social media—as compared to a mere 7% in 2005.[2]  And for young adults from ages eighteen to twenty-nine, social media usage is nearly ubiquitous: a full 90% of people in this age bracket use social networking sites/applications.[3]  Of these users, many visit social media platforms on a daily basis, even multiple times a day.[4]  In other words, "[s]ocial media has become indispensable to daily life."[5]

With this popularity comes the unfortunate but inevitable problem that social media posts, like any other form of communication, can be used to make threats of violence.[6]  But many threats made on social media will fall outside the narrow language of section 836.10, which was originally written with pen-and-paper letters in mind.  The statute was enacted in 1913, and since that time its language has remained

---

[2]Andrew Perrin, Social Media Usage: 2005-2015, Pew Research Center, 2, 4 (Oct. 8, 2015), http://www.pewinternet.org/files/2015/10/PI_2015-10-08_Social-Networking-Usage-2005-2015_FINAL.pdf.

[3]Id.

[4]Maeve Duggan, Nicole B. Ellison, Cliff Lampe, Amanda Lenhart, Mary Madden, Social Media Update 2014, Pew Research Center, 3 (Jan. 9, 2015), http://www.pewinternet.org/files/2015/01/PI_SocialMediaUpdate20144.pdf.

[5]Marie-Helen Maras, Unprotected Speech Communicated Via Social Media: What Amounts to A True Threat?, 19 No. 3 J. Internet L. 3, *8 (2015).

[6]See, e.g., How to Crack Down on Social Media Threats, New York Times (August 3, 2016), http://www.nytimes.com/roomfordebate/2016/08/03/how-to-crack-down-on-social-media-threats (showcasing various opinions on how to address the problem of violent threats made online); Maras, supra, at *3 ("[T]here is a dark side to social media.  In particular, these sites have been utilized as forums within which to engage in antisocial behaviors, such as harassment and bullying, and to communicate criminalized speech."); Online Harassment, Pew Research Center (Oct. 22, 2014), http://www.pewinternet.org/files/2014/10/PI_OnlineHarassment_72815.pdf (reporting the prevalence of online harassment, including physical threats).

virtually the same.  See Macchione v. State, 123 So. 3d 114, 115 (Fla. 5th DCA 2013).

It is true that the statute was amended in 2010 to include "electronic communication,"

but the language requiring the communication to be sent directly remained intact.  See

id. at 116.

The narrow language of section 836.10 will not encompass many threats

made via social media because, as acknowledged by the First District in O'Leary, social

media is often used to post communications publicly, for the whole world to see, instead

of sending those communications directly to any specific person.  109 So. 3d at 877.

This is problematic because, even though social media posts may not travel directly,

they are often shared with the understanding or expectation that they will be widely

distributed, even outside the original poster's own network of friends or followers.

Indeed, social media is designed for information to be shared amongst users not only

indirectly but also rapidly and virally:

> Generally speaking, "social media" refers to a web-based
> platform through which the general public can create and
> discuss the information it contains, in contrast to websites
> that retain exclusive control over the content being published
> and simply display it for consumption by its users.  More
> specifically, true social media sites seem to have three
> defining characteristics: (1) the information being posted is
> not directed at anyone in particular; (2) the information being
> posted can be edited and/or discussed by all who see it; and
> (3) the information posted includes an easy way to share it
> with people not included within the scope of the original
> post.[7]

Because of these unique dynamics of communication on social media, any unprotected

post can "go viral," by "rapidly—and often uncontrollably—propagat[ing] across the

---

[7]Aaron W. Brooks, Social Media 101, 29 No. 3 GPSolo 54, 55 (May/June 2012).

- 8 -

internet."[8]  In this context, a threat of violence made publicly on social media is likely to reach its target and cause fear of bodily harm just like a traditional letter might.  See Smith v. State, 532 So. 2d 50, 52 (Fla. 2d DCA 1988) ("Section 836.10 is justified by the right of all persons to live free of unexpected and unwarranted fear of harm.").  The facts of the instant case exemplify this phenomenon.  Accordingly, the legislature may wish to revisit section 836.10 to address the modern problem of threats issued and shared publicly on social media.

Reversed and remanded with directions to vacate J.A.W.'s disposition.

CASANUEVA and LUCAS, JJ., Concur.

---

[8]Id.